IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

WILLIAM V. RASH                                              PLAINTIFF


         v.                          CIVIL NO. 17-3009


NANCY A. BERRYHILL,[1] Commissioner
Social Security Administration                              DEFENDANT


### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, William V. Rash, brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration (Commissioner) denying his claims for a period of disability and disability insurance benefits (DIB) and supplemental security income (SSI) benefits under the provisions of Titles II and XVI of the Social Security Act (Act).  In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision.  See 42 U.S.C. § 405(g).


I.      **Procedural Background:**

Plaintiff protectively filed his current applications for DIB and SSI on June 17, 2014, alleging an inability to work since May 4, 2013, due to white matter brain disease, multiple sclerosis, tremors, hypothyroidism, high blood pressure, depression, migraine headaches,

---

[1] Nancy A. Berryhill, has been appointed to serve as acting Commissioner of Social Security, and is substituted as Defendant, pursuant to Rule  25(d)(1) of the Federal Rules of Civil Procedure.

sleeping disorder, episodic respiratory disease, chronic obstructive pulmonary disease (COPD), asthma, neck damage, left elbow surgery with numbness in the left shoulder and fingers, right knee surgery, and osteoarthritis of the cervical and lumbar spine. (Tr. 343, 370, 412-413). For DIB purposes, Plaintiff maintained insured status through June 30, 2017. (Tr. 15). An administrative hearing was held on February 29, 2016 at which Plaintiff appeared with counsel and testified. (Tr. 83-117). A supplemental hearing was held on August 3, 2016 at which Plaintiff appeared again with counsel and testified. (Tr. 34-82).

By written decision dated September 26, 2016, the ALJ found that during the relevant time period, Plaintiff had an impairment or combination of impairments that were severe. (Tr. 16). Specifically, the ALJ found Plaintiff had the following severe impairments: multiple sclerosis/white matter disease (MS), essential hypertension, hypothyroid disease, COPD, disorder of the left shoulder, degenerative joint disease (DJD) of the cervical spine, disorder of the right knee, disorder of the left elbow status post left ulnar decompression and epicondylectomy, obstructive sleep apnea, headaches, essential tremor, a neurocognitive disorder, and a depressive disorder. (Tr. 16). However, after reviewing all of the evidence presented, the ALJ determined that Plaintiff's impairments did not meet or equal the level of severity of any impairment listed in the Listing of Impairments found in Appendix I, Subpart P, Regulation No. 4. (Tr. 16-18). The ALJ found Plaintiff retained the residual functional capacity (RFC) to:

> perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he is able to occasionally climb ramps and stairs; he can never climb ladders, ropes or scaffolds; he can occasionally balance, stoop, kneel, crouch and crawl; and he can occasionally reach and handle bilaterally. In addition, he must avoid concentrated exposures to temperature extremes, humidity, fumes, odors, dusts, gases, poor ventilation and hazards. Further, the claimant is able to perform work where interpersonal contact is routine but superficial, tasks are no more complex than those learned by experience, with several variables and use of

2

judgment within limits, and supervision required is little for routine tasks but detailed for non-routine tasks.

(Tr. 18-19).

With the help of a vocational expert, the ALJ determined Plaintiff could perform work as a blending tank tender, cotton classer aid, and fruit distributor tender. (Tr. 26).

Plaintiff then requested a review of the hearing decision by the Appeals Council, which denied that request on November 22, 2016. (Tr. 1-6). Subsequently, Plaintiff filed this action. (Doc. 1). Both parties have filed appeal briefs, and the case is before the undersigned for report and recommendation. (Docs. 13, 16).

The Court has reviewed the entire transcript. The complete set of facts and arguments are presented in the parties' briefs, and are repeated here only to the extent necessary.

## II.    Evidence Presented:

At the time of the initial administrative hearing held on February 29, 2016, Plaintiff was forty-six years of age and obtained a high school diploma. (Tr. 87). A review of the pertinent medical evidence reflects the following.

On August 29, 2006, Plaintiff underwent a laparoscopic appendectomy. (Tr. 1065). Post-surgery workup revealed elevated thyroid-stimulating hormone (TSH), and he began taking Synthroid. (Tr. 1065-1066).

On May 22, 2012, a pulmonary function test showed Plaintiff had normal lung volumes, mild diffuse defect, and mild-to-moderate air flow obstruction. (Tr. 448-449). An echocardiogram performed on the same date revealed borderline diastolic function. (Tr. 449-450, 995-997).

3

On March 14, 2013, Plaintiff presented himself to the emergency department of Mercy Hospital, and he was diagnosed with bilateral tennis elbow. (Tr. 554-569). He was prescribed Norco and Mobic. (Tr. 558).

The medical evidence continues after the alleged onset date of May 4, 2013, which corresponds to the date Plaintiff fell from a ladder at work. Plaintiff went to the emergency department of Mercy Hospital after falling from a height of about 12 feet with a reported brief loss of consciousness. (Tr. 451-458, 570-595). He complained of moderate left rib, chest, right knee, and head pain. (Tr. 451). His physical exam was normal except for pulmonary or chest tenderness. (Tr. 451-452). A computerized tomography (CT) scan of his head was normal. (Tr. 457). A right knee X-ray was normal as well. (Tr. 458). A thoracic spine X-ray showed mild curvature with no evidence of acute fracture dislocation. (Tr. 458). Plaintiff was diagnosed with a fall from ladder causing accidental injury and contusion of chest wall. (Tr. 570). Plaintiff was prescribed Lortab. (Tr. 570).

On May 6, 2013, Plaintiff presented himself to the emergency department of Washington Regional Medical Center, and he was diagnosed with a minor closed head injury and internal derangement of the knee. (Tr. 484-494). A head CT scan showed no acute intracranial process. (Tr. 493). A cervical spine X-ray revealed cervical spine straightening that may be due to positioning or muscle spasm, but no acute fracture or subluxation was observed. (Tr. 493-494).

On May 10, 2013, a right knee magnetic resonance imaging (MRI) study showed small joint effusion and small bone contusion of the outer aspect of the lateral facet of the trochlea, intact menisci, and intact ligaments. (Tr. 495, 530-531).

On May 11, 2013, Plaintiff was diagnosed with knee sprain and referred to physical therapy (PT). (Tr. 498-503, 529).

On May 21, 2013, Plaintiff was initially evaluated for PT services at HealthSouth due to a right knee sprain. (Tr. 879-882, 896-897, 901-903).

From May 21, 2013 to June 10, 2013, Plaintiff attended eight PT sessions at HealthSouth to improve the range of motion, strength, and pain of his right knee. (Tr. 532, 865-882, 896-897, 901-903). The physical therapist, Ms. Samantha Sullivan, opined that Plaintiff would benefit from an orthopedic specialist reviewing the previous MRI study results and a second study might be warranted. (Tr. 532, 865-866). Plaintiff attended PT sessions regularly until September 27, 2013, but he cancelled some sessions due to a lack of gas money. (Tr. 819-928).

On June 19, 2013, Dr. Michael Westbrook provided a note stating Plaintiff was unable to work at the time due to continued knee pain. (Tr. 528). An orthopedic visit was scheduled on June 19, 2013, and Plaintiff was to follow up with Dr. Westbrook afterwards. (Tr. 528).

On June 19, 2013, Plaintiff reported during his initial visit with Dr. Brian G. Ogg, an orthopedic surgeon that he fell while on a ladder at work by reaching up to reattach a rope to a door. (Tr. 508-510, 778-780, 942-944). Bilateral knee X-rays were negative for fracture and chondrocalcinosis. (Tr. 812-813). Dr. Ogg suspected a symptomatic lateral meniscus tear of the right knee. (Tr. 510).

On June 25, 2013, Dr. Ogg performed a right knee arthroscopy; synovectomy; resection of infrapatellar Hoffa fat pad, medial plica, plica mucosa; and impinging anterior medial synovium. (Tr. 459-466, 809-811). The surgery revealed no meniscus tear, but abundant synovitis, prominent Hoffa's fat pad, and medial plica were discovered. (Tr. 461, 809).

5

On July 10, 2013, Plaintiff complained his knee was stiff and swollen during a post-op appointment. (Tr. 511-512, 527, 781-782, 945-946). Upon examination, Plaintiff had mild joint effusion; a knee range of motion of zero to 120 degrees; and he was able to straight leg raise. (Tr. 511, 527). Dr. Ogg explained to Plaintiff that he had no significant degenerative findings or a meniscal tear. (Tr. 511, 527). Dr. Ogg determined Plaintiff could return to work at light duty with no bending, lifting, stopping, twisting, and etcetera. (Tr. 511, 527). Plaintiff's Naproxen was refilled, and Dr. Ogg ordered PT to help Plaintiff with gait training, strengthening, range of motion, and work hardening attention. (Tr. 511, 527). Dr. Ogg anticipated Plaintiff could return to regular duties at work at the next follow up visit in four weeks. (Tr. 512, 527).

On July 19, 2013, Dr. Ogg noted Plaintiff had multiple call-ins to the office about different issues he was having with physical therapy and persistent pain. Dr. Ogg noted Plaintiff's complaints were inconsistent with physical findings discovered at the arthroscopy and in the MRI study. (Tr. 513-514, 521, 783-784, 947-948). Plaintiff's wife reported that her husband returned to janitorial work, and the work included squatting and other tasks she felt were prohibited in the return to work letter. (Tr. 513). Dr. Ogg found Plaintiff had no ligamentous instability when examined. (Tr. 514). Bilateral knee X-rays and a right ankle X-ray were negative. (Tr. 978). Dr. Ogg found that he did not have any reason to alter Plaintiff's work restrictions. (Tr. 514). Dr. Ogg determined Plaintiff would benefit from a patellofemoral tracking brace, prescribed Gabapentin, and recommended additional exercises for quadriceps strengthening. (Tr. 514).

On August 12, 2013, Plaintiff complained of discomfort over the medial joint line, and he reported the brace was uncomfortable and cumbersome. (Tr. 515-517, 525-526, 785-787,

949-951). Dr. Ogg administered a Cortisone injection as treatment, and he recommended Plaintiff continue with PT, work restrictions, and he had no exercise restrictions. (Tr. 515-517, 525-526). Dr. Ogg also prescribed Gabapentin and Meloxicam. (Tr. 515-517, 525-526).

On September 9, 2013, Plaintiff reported that he did not feel he could return to work at all. (Tr. 518-519, 523-524, 788-789, 952-953). Dr. Ogg wrote he was "curious as to why this gentleman cannot return to work." (Tr. 519, 523). Dr. Ogg did not find objective explanation for Plaintiff's continued complaints. (Tr. 523). Dr. Ogg felt Plaintiff was at maximum medical improvement. (Tr. 523). Plaintiff was referred back to PT for impairment evaluation, but Dr. Ogg was unsure Plaintiff was making progress in PT to warrant continued participation. (Tr. 519, 523). Dr. Ogg noted that Plaintiff was seeking a remaining evaluation from a neurologist. (Tr. 519, 524). Dr. Ogg acknowledged Plaintiff might have a degree of prolonged recuperation due to a period of immobility and perhaps legitimate complaint of a contusion knee injury. (Tr. 519, 524). However, Dr. Ogg found that by this point he expected Plaintiff to be much improved and generally stable for return to work. (Tr. 519, 524).

On September 27, 2013, Ms. Sullivan completed a PT discharge assessment and found Plaintiff met his goals and achieved maximum functional potential. (Tr. 890). Plaintiff reported to Ms. Sullivan that he felt capable of performing all work duties and had no pain or problems. (Tr. 904).

On September 30, 2013, Mr. James A. Honey, a physical therapist, completed a physical therapy impairment evaluation. (Tr. 760-766). At the time of the ladder fall, Plaintiff was employed as a tire technician at Terry's Tires. (Tr. 761). Mr. Honey noted that Plaintiff was referred to PT because of a right knee arthroscopy. (Tr. 760). Mr. Honey's assessment included residual quadriceps muscular weakness, grade 4, and right knee extension, Table 39.

7

(Tr. 763). Mr. Honey assessed a lower extremity impairment of 12 percent or 5 percent whole person impairment. (Tr. 763). Mr. Honey planned to await Dr. Ogg's interval evaluation. (Tr. 763).

On October 4, 2013, Plaintiff presented himself to a neurologist, Dr. Reginald Rutherford. (Tr. 689). Dr. Rutherford noted Plaintiff's abnormal brain MRI study demonstrated moderate white matter disease that clearly was in excess of what could be attributed to age. (Tr. 689). Plaintiff complained of increasing headache and visual disturbance, and visual blurring. (Tr. 689). Plaintiff was referred to Dr. Andrew Lawton for a neuro-ophthalmological evaluation to assess his optic nerve. (Tr. 689). Dr. Rutherford determined blood work and a lumbar puncture for spinal fluid analysis was required to differentiate between trauma and other possible etiologies. (Tr. 689). Dr. Rutherford also found it was necessary for Plaintiff to undergo a neuropsychological examination. (Tr. 689). Once the diagnostic studies were completed, a follow up visit with Dr. Rutherford was required. (Tr. 689).

On October 8, 2013, Dr. Ogg agreed with the findings of Mr. Honey's PT impairment evaluation. (Tr. 520, 790, 954). Mr. Honey and Dr. Ogg both assessed that Plaintiff's lower extremity impairment was 12 percent or was at 5 percent for a whole person impairment. (Tr. 520).

On December 9, 2013, Plaintiff went to the emergency department of Mercy Hospital complaining of vomiting and headaches. (Tr. 596-614, 618-621). Plaintiff was diagnosed with headache and white matter disease by history and prescribed Norco. (Tr. 596-614, 618-621).

On June 9, 2014, Plaintiff presented himself to the emergency department of Mercy Hospital complaining of left arm tingling, extremity weakness, and resolved chest pain. (Tr.

465-479). An electrocardiogram (EKG), head CT, and chest X-ray were negative. (Tr. 473-474). Plaintiff was diagnosed with chest pain, weakness of the left arm, and paresthesia. (Tr. 471-472). He was instructed to follow up with a cardiologist and neurologist. (Tr. 471-472).

On June 16, 2014, Plaintiff went to the emergency department of Sparks Regional Medical Center complaining of paresthesia in the left upper extremity. (Tr. 655-687, 693-721, 726-733, 748-755). A brain MRI study and CT scan revealed deep white matter in the distribution of the centrum semiovale demonstrated multiple areas of increased signal abnormality primarily in a pericallosal distribution that was suggestive of a primary demyelinating process such as MS. (Tr. 660, 673, 691). Dr. Jon Gustafson recommended Plaintiff have an outpatient evaluation with a neurologist. (Tr. 660). Dr. Michelle Horan diagnosed Plaintiff with paresthesia and white matter disease in the brain. (Tr. 655).

On July 9, 2014, Plaintiff presented himself to Dr. Nicola Sarohia to establish care. (Tr. 734-742). Dr. Sarohia interpreted Plaintiff's brain MRI study as revealing primary demyelinating process of such that MS was a possibility. (Tr. 734). Dr. Sarohia also diagnosed Plaintiff with hypertension, hypothyroidism, COPD, and depression. (Tr. 739-740). Plaintiff's medications at the time included: Advair Diskus, Levothyroxine Sodium, Ventolin HFA, Amlodipine Besylate, Celexa, Neurontin, and Mobic. (Tr. 740). Plaintiff reported he dipped tobacco since he was five years old and smoked daily. (Tr. 738-739). Dr. Sarohia provided tobacco use cessation counseling. (Tr. 740).

On July 24, 2014, Plaintiff complained of left arm, left hand, cervical, and upper back pain with difficulty lifting and grasping items. (Tr. 743-746, 987-990). Plaintiff reported Mobic and Gabapentin were not helping much, and unfortunately he missed his neurology appointment because he was not informed of it. (Tr. 743). Plaintiff also reported that he was

9

never a smoker. (Tr. 745).  Upon exam, he had pain upon palpation of C7/T1 vertebrate, stiffness with active range of motion in all directions of the neck, 4/5 strength of left hand grasp, and no focal pain in the left hand or forearm. (Tr. 744).  X-ray of the cervical spine showed some decreased intervertebral space C7/T1. (Tr. 745, 985-986).  Dr. Sarohia ordered PT. (Tr. 745).

On July 31, 2014, Plaintiff presented himself to Dr. Steve-Felix Belinga, a neurologist, after a 2013 diagnosis of MS by the late Dr. Rutherford. (Tr. 991-994, 1018-1022).  Plaintiff reported his fall history; weakness and numbness of the left upper extremity; sharp, tingling neck pain; numbness of the fourth and fifth digits of the left hand; low back pain; headaches; and memory loss. (Tr. 991).  Upon exam, Dr. Belinga noted that Plaintiff had a brisk left knee reflex, but there was no evidence of increased tone in the left knee. (Tr. 994).  Plaintiff's strength was almost symmetrically bilateral with a decrease in sensation. (Tr. 994).

Dr. Belinga opined about DJD of the cervical spine as well as radiculopathy because MS did not produce as much pain as Plaintiff described. (Tr. 994).  Dr. Belinga wanted to review the brain MRI study and a cervical spine MRI study, if available, before moving forward with a spinal tap. (Tr. 994).  Dr. Belinga diagnosed Plaintiff with DJD of the cervical spine, possible MS, neck pain, paresthesias, and numbness. (Tr. 994).  Dr. Belinga also increased Plaintiff's Cymbalta to 30 mg and ordered a nerve conduction study of the left upper extremity. (Tr. 994).

On August 27, 2014, Dr. Sarohia diagnosed Plaintiff with left arm pain; obstructive sleep apnea; congestive heart failure, unspecified; and a tick bite. (Tr. 1000).  Dr. Sarohia ordered a sleep study, EKG, Doppler ultrasound, and Color Flow to determine if Plaintiff's symptoms were not just related to COPD, but also congestive heart failure. (Tr. 999-1000).

10

On September 9, 2014, a cervical spine MRI study showed some disc bulges, but not demyelinating lesions. (Tr. 1028). Plaintiff was diagnosed with DJD of the cervical spine, neck pain, paresthesias, and numbness. (Tr. 1028). Dr. Belinga increased Cymbalta to 60 mg, referred Plaintiff to an orthopedic specialist for his elbows, and ordered PT for neck exercises. (Tr. 1028).

On September 12, 2014, Plaintiff had an initial PT evaluation, and his treatment diagnosis was cervical pain, left upper extremity impairment, and DJD. (Tr. 626, 766-771).

On September 22, 2014, Plaintiff returned to Dr. Ogg complaining of left elbow pain along with progressive numbness and weakness in the ring and little finger. (Tr. 791-793, 804-807, 955-957). Plaintiff reported difficulty with gripping or releasing items, and the left elbow was the most bothersome and uncomfortable. (Tr. 791). Plaintiff's left elbow had exquisite tenderness and sensitivity about the ulnar nerve and groove with positive Tinel's sign. (Tr. 791). Plaintiff saw Dr. Belinga previously, and electromyography (EMG) study findings were consistent with cubital tunnel syndrome and tardy ulnar nerve palsy bilaterally. (Tr. 791). A left elbow X-ray showed normal joint spaces and cubital tunnel syndrome. (Tr. 811-812, 978-979). Dr. Ogg diagnosed Plaintiff with cubital tunnel syndrome of the left elbow, and the elbow compression of the ulnar nerve was mild to moderate. (Tr. 792). Dr. Ogg recommended an ulnar nerve decompression and medial epicondylectomy. (Tr. 792). Dr. Ogg was unsure if Plaintiff's MS had any influence on his potential for recovery. (Tr. 792).

On September 30, 2014, Dr. Ogg performed an ulnar nerve decompression of the left elbow and medial epicondylectomy. (Tr. 807-809).

On October 8, 2014, Plaintiff returned for a follow up visit one week after an ulnar nerve decompression and medial epicondylectomy of the left elbow. (Tr. 795-797, 959-961).

11

Plaintiff's wife reported her husband was having discomfort and numbness of his thumb, trouble sleeping, and stated he needed stronger pain medications. (Tr. 795). Dr. Ogg found such symptoms out of the ordinary. (Tr. 795). Dr. Ogg decided to continue Plaintiff's pain medications as ordered, 7.5 mg of Hydrocodone, and a new dressing and splint were applied to alleviate some pressure or tightness. (Tr. 796).

On October 9, 2014, Plaintiff reported moderate shortness of breath and wheezing with exertion. (Tr. 1002-1005). Plaintiff's medication regimen included an albuterol inhaler and Advair. (Tr. 1002). Dr. Sarohia added Spiriva Handihaler to better control Plaintiff's COPD symptoms. (Tr. 1004).

On October 15, 2014, non-examining consultant, Dr. Jerry Thomas determined Plaintiff retained the ability to perform a full range of light work. (Tr. 130-131).

On October 15, 2014, Plaintiff returned to Dr. Ogg complaining of elbow discomfort and sensation of numbness in the index finger. (Tr. 798-799, 962-963). Dr. Ogg estimated three to six months for nerve regeneration and improvement of symptoms. (Tr. 798-799). Dr. Ogg noted that Plaintiff might have an incomplete resolution due to the chronicity of the disease. (Tr. 799).

On October 17, 2014, Dr. Ogg did not see any evidence of the blistering, rash, or erythema that was reported by the Plaintiff. (Tr. 800-802, 964-966). Dr. Ogg noted that by the next scheduled follow up visit in a week and a half, he anticipated Plaintiff could return to activities without restrictions. (Tr. 801).

On October 27, 2014, Plaintiff complained of discomfort and aching over the upper outer aspect of the shoulder and lateral aspect of the elbow. (Tr. 803-804, 967-968). Dr. Ogg determined Plaintiff could gradually resume regular activities to tolerance without any

restrictions. (Tr. 803).  Dr. Ogg explained to Plaintiff that his pain was not attributable to the ulnar nerve and further workup might be required. (Tr. 803).

On November 10, 2014, Plaintiff underwent a mental consultative examination performed by Dr. Patricia J. Walz. (Tr. 931-935).  Plaintiff reported that he had fatigue, anxiety around people, no hallucinations, and a suicidal ideation with no attempts. (Tr. 931).  Plaintiff stated that sometimes he has problems getting along with co-workers because he would "blow up" on them. (Tr. 932).  Plaintiff has been on Cymbalta and Celexa since June 2014, and he reported the medications were helping a little bit. (Tr. 932).  Plaintiff stated he was upset the board let him go from the fire chief position he held for 22 years. (Tr. 932).  Plaintiff described his overall health as good, and he was able to follow a recipe and cook, feed the dogs, and exercise nightly by walking 30 minutes to one hour. (Tr. 932).  Plaintiff reported not sleeping well, and that he got only three to four hours of sleep at night. (Tr. 932).  Plaintiff stated he dipped tobacco and went through three to four cans a week, but he had not drank alcohol in years. (Tr. 933).  Dr. Walz noted Plaintiff's affect was consistent with his euthymic mood, and Plaintiff reported cognition changes and depression related to MS. (Tr. 933).

Dr. Walz conducted a mental status exam and found Plaintiff's intellectual functioning was thought to be in the low average range. (Tr. 933-934).  Dr. Walz diagnosed him with mild neurocognitive disorder due to MS, depressive disorder due to MS, and alcohol use disorder in sustained remission. (Tr. 934).  Dr. Walz noted Plaintiff was able to drive; manage funds if necessary; spend time with friends with whom he shoots guns and hunts; and attend church regularly.  (Tr. 934).  Plaintiff had an alright balance with a few falls and muscle spasms in fingers and upper arms. (Tr. 934).  Dr. Walz assessed Plaintiff's social skills were good, his speech was clear and intelligible, and he had basic labor jobs previously showing he had the

capacity to cope with the typical mental/cognitive demands of basic work-like tasks. (Tr. 934). Dr. Walz also found Plaintiff's attention and concentration was fair, but when he was having a flare up of MS it might become worse. (Tr. 934).  Dr. Walz assessed Plaintiff's capacity to sustain persistence in completing tasks was diminished by fatigue associated with MS. (Tr. 934).  Dr. Walz also found Plaintiff's speed of information processing was a bit slow. (Tr. 934).  Dr. Walz determined Plaintiff was not exaggerating or malingering, and he could manage funds without assistance. (Tr. 934).

On November 13, 2014, non-examining consultant, Dr. Winston Brown, determined Plaintiff retained the ability to perform semiskilled work. (Tr. 131-133).  Dr. Brown found Plaintiff had mild restrictions of activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation, each of extended duration. (Tr. 128).

On December 11, 2014, Plaintiff complained of tenderness over the left medial elbow and radiating pain in the left arm and shoulder, but Dr. Ogg found Plaintiff could resume normal activities with no restrictions. (Tr. 969-971).  Dr. Ogg administered a Cortisone injection into Plaintiff's left shoulder. (Tr. 970).  Dr. Ogg also recommended massage of the elbow with vitamin E and an exercising program. (Tr. 970).

On December 17, 2014, Plaintiff arrived to an initial PT evaluation ambulating independently and with the left upper extremity in a non-guarded position. (Tr. 623). The plan was for PT sessions three times per week for four to six weeks. (Tr. 624).

On January 8, 2015, Dr. Ogg diagnosed Plaintiff with left shoulder impingement and rotator cuff tendinitis that failed to improve with exercise, Dr. Ogg administered a Cortisone

injection, and prescribed nonsteroidal anti-inflammatory medication. (Tr. 973).  Dr. Ogg suspected a rotator cuff tear and recommended an MRI study. (Tr. 973).

On January 7, 2015, Ms. Amy Edge, a physical therapy assistant, noted that Plaintiff had no significant change in range of motion or pain since evaluation. (Tr. 632-634).  Plaintiff reported pain at end range of motion and partial compliance with the home exercise program. (Tr. 634).

On February 5, 2015, Plaintiff's left shoulder MRI study revealed partial thickness bursal surface tear, but no full-thickness tearing of the cuff. (Tr. 974-975, 979-980).  Upon exam, Plaintiff had limited abduction of 100 degrees, forward flexion of 90 degrees, external rotation 60 degrees, and internal rotation to L5. (Tr. 974).  Dr. Ogg noted Plaintiff had good push-off strength; good external rotation; negative sulcus sign; and positive Neer, Hawkins, and empty can test. (Tr. 974-975).  Dr. Ogg recommended PT for rotator cuff exercises and modalities, and he administered an injection into Plaintiff's left shoulder. (Tr. 975).

On February 23, 2015, Dr. Sarohia increased Plaintiff's Synthroid due to a high TSH level. (Tr. 1006).

On March 10, 2015, Plaintiff continued to struggle with his left shoulder. (Tr. 976-977).  Plaintiff admitted to missing several PT sessions due to a death in the family and lack of transportation. (Tr. 976-977).  Dr. Ogg diagnosed him with MRI-proven rotator cuff tendinitis, no full-thickness cuff tear, and perhaps some slight articular surface thinning. (Tr. 977).  Dr. Ogg administered a left shoulder injection, and he reordered PT for Plaintiff's left shoulder and elbow. (Tr. 977).

On April 21, 2015, Dr. Walz submitted a Medical Source Statement based on the November 10, 2014 mental consultative examination she conducted.  (Tr. 1013-1014).

15

Dr. Walz found Plaintiff was not impaired in the ability to work in coordination with or proximity to others without being distracted by them; make simple work-related decisions; interact appropriately with the general public; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. (Tr. 1013-1014). Dr. Walz assessed Plaintiff would have impaired performance for five percent of an eight-hour workday of the following: the ability to understand and remember very short and simple instructions; ability to carry out very short and simple instructions; ability to sustain an ordinary routine without special supervision; and the ability to respond appropriately to changes in the work setting. (Tr. 1013-1014).

Dr. Walz also found Plaintiff had impaired performance for ten percent of an eight-hour workday of the following: the ability to understand and remember detailed instructions; the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and the ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes. (Tr. 1013-1014). Dr. Walz further assessed Plaintiff had impaired performance 15 percent or more of an eight-hour workday of the following: the ability to remember locations and work-like procedures; and the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods due to fatigue and concentration/memory problems related to MS. (Tr. 1013-1014). Dr. Walz noted Plaintiff was not working when she conducted the

16

mental consultative examination, and thus did not answer the question regarding the estimated average days per month he would likely be absent from work. (Tr. 1014).

On April 22, 2015, non-examining consultant, Dr. Kevin Santulli, determined Plaintiff had mild restrictions of activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation, each of extended duration. (Tr. 167). Upon reconsideration, Dr. Santulli determined Plaintiff retained the ability to perform semiskilled work. (Tr. 170-172).

On May 7, 2015, Ms. Joann D. Eiman, a physician assistant, diagnosed Plaintiff with neuropathy, hypertension, and MS. (Tr. 1109-1110). Plaintiff also had a history of COPD with no history of smoking, but his wife was a smoker. (Tr. 1109). Plaintiff's Gabapentin was refilled, and Amlodipine was prescribed. (Tr. 1109).

On May 12, 2015, Dr. Ahmad Al-Khatib, M.D. completed a neurological consultative examination. (Tr. 1016-1017). Plaintiff complained of upper and lower extremity issues, tremor involving both hands, memory loss, and diffuse daily headache. (Tr. 1016). A brain MRI study obtained on June 16, 2014, revealed multiple areas of T2 hyperintensities involving the deep white matter of the centrum semiovale and pericallosal regions raising the possibility of demyelinating process such as MS. (Tr. 1016). Plaintiff reported being diagnosed with MS in the past, but no spinal fluid testing was conducted at that time. (Tr. 1016). Gabapentin and Imitrex were prescribed for his headaches. (Tr. 1016). A mini-mental status exam score was noted to be 30 out of 30, his speech and language were intact, and his affect was normal. (Tr. 1017). Upon exam, Dr. Al-Khatib noted evidence of very mild action and postural-type tremor involving both hands. (Tr. 1017). Gait and coordination were normal, examination of the spine

17

was unremarkable, and Plaintiff had diminished pinprick and light to sensation over the left upper and lower extremities. (Tr. 1017).

Plaintiff was diagnosed with possible MS that needed confirmation by reviewing the brain and spine MRI studies and the possibility of spinal fluid testing for demyelinating process. (Tr. 1017). Dr. Al-Khatib also diagnosed Plaintiff with memory loss, likely secondary to mild neurocognitive disorder due to possible MS; chronic headaches with tension features; and mild benign essential tremor. (Tr. 1017). Dr. Al-Khatib assessed based on the findings and impression, there was no definite evidence of limitations in sitting, standing, walking, carrying, handling objects, hearing, speaking, or traveling. (Tr. 1017).

On July 13, 2015, an X-ray of his left elbow showed probable chronic lateral epicondylitis and questionable old radial head fracture. (Tr. 1114).

On July 20, 2015, Dr. Robert Redd, a non-examining consultant at the reconsideration level, affirmed the findings of Dr. Thomas that Plaintiff could perform the full range of light work. (Tr. 169-170).

On December 26, 2015, Plaintiff went to the emergency department of Northwest Medical Center after a piece of metal that measured 14-15 feet long fell on him two days prior at work. (Tr. 1047-1057). Plaintiff reported that his right arm was pinned, and he was having continued pain in the mid arm. (Tr. 1049-1050). An X-ray of the right elbow was normal, and Plaintiff was diagnosed with an elbow contusion. (Tr. 1054, 1057).

On January 14, 2016, Plaintiff reported an arm contusion, and Plaintiff's wife wanted his antidepressant increased. (Tr. 1097-1104). Dr. Kenneth Poemoceah diagnosed him with an arm injury and refilled medications. (Tr. 1098, 1100, 1104). A right elbow X-ray revealed no acute osseous, articular, or soft tissue abnormality. (Tr. 1113).

18

On February 11, 2016, Plaintiff reported having MS, aching, and the inability to sleep. (Tr. 1094).  Dr. Poemoceah diagnosed him with a stable arm injury and DJD. (Tr. 1094-1096). Dr. Poemoceah refilled medications and ordered a sleep study. (Tr. 1096).

On February 24, 2016, Dr. Poemoceah completed a Multiple Sclerosis Questionnaire for Social Security checklist form. (Tr. 1040-1042).   Dr. Poemoceah determined present significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station. (Tr. 1040). Dr. Poemoceah also marked as present significant, reproducible fatigue or motor function with substantial muscle weakness on repetitive activity, demonstrated on physical examination, resulting from neurological dysfunction in areas of the central nervous system to be pathologically involved by the MS process. (Tr. 1040).   Dr. Poemoceah found present impairment of the central visual acuity with remaining vision in the better eye after best correction was 20/200 or less. (Tr. 1040).   Dr. Poemoceah found insufficient evidence of contraction of peripheral visual fields in the better eye or loss of visual efficiency. (Tr. 1040-1041).

Dr. Poemoceah assessed Plaintiff would need to take unscheduled breaks during an eight-hour working shift; impairments would likely produce "good days" and "bad days: and estimated on average Plaintiff was likely to be absent from work about four days per month as a result of the impairments or treatment. (Tr. 1041).  Dr. Poemoceah marked that he did not expect a fundamental or marked change for the better in the future for the Plaintiff. (Tr. 1041). Dr. Poemoceah assessed Plaintiff could stand continuously for 15 minutes, and he could stand cumulatively for one hour during an eight-hour workday, not including time spent sitting or lying down. (Tr. 1041).   Dr. Poemoceah found Plaintiff could walk less than 15 minutes

continuously; walk one hour cumulatively during an eight-hour workday, not including time spent sitting or lying down; and the total combined walking and standing in an eight-hour workday was less than one hour. (Tr. 1041).  Plaintiff was found to be able to occasionally lift/carry 11-20 pounds and frequently lift/carry ten pounds or less. (Tr. 1041).  Dr. Poemoceah assessed Plaintiff could not use both hands for repetitive actions such as simple grasping, pushing, and pulling. (Tr. 1042).

On March 10, 2016, Dr. Poemoceah diagnosed Plaintiff with a stable arm injury, increased DJD pain, and stable MS. (Tr. 1091-1093).  Dr. Poemoceah ordered a pain contract and a sleep study. (Tr. 1093).

On April 13, 2016, Dr. Poemoceah refilled Plaintiff's DJD medications. (Tr. 1088-1090).  Dr. Poemoceah also noted Plaintiff's MS was stable and diagnosed him with bronchitis. (Tr. 1090).

On May 2, 2016, Dr. Poemoceah diagnosed Plaintiff with a tick bite. (Tr. 1085-1087).

On May 11, 2016, Plaintiff returned to Dr. Poemoceah for a follow up visit and refills. (Tr. 1082-1084).  Dr. Poemoceah noted Plaintiff's arm injury and MS were stable, and the DJD medications were refilled. (Tr. 1084).

On June 10, 2016, Plaintiff complained of tick bites on his legs and right side of his chest. (Tr. 1117-1119).  Dr. Poemoceah diagnosed him with DJD, stable MS, and tick bites. (Tr. 1119).

On June 29, 2016, Plaintiff returned to Dr. Poemoceah for a follow up visit after tick bites. (Tr. 1123-1125, 1132-1134).

On July 8, 2016, Plaintiff presented himself to Dr. Poemoceah for a checkup. (Tr. 1135-1137).

On August 5, 2016, Plaintiff reported a flair of joint pain. (Tr. 1138-1140). Dr. Poemoceah diagnosed him with DJD, stable MS, and hypothyroidism. (Tr. 1140).

On August 25, 2016, Plaintiff reported having chest pain and sweating. (Tr. 1144-1147). Lab work and EKG were normal, and Dr. Poemoceah scheduled a nuclear stress test. (Tr. 1146). Dr. Poemoceah noted that Plaintiff was doing well on current treatment and wanted to continue treatment. (Tr. 1147).

On September 6, 2016, Dr. Poemoceah diagnosed Plaintiff with DJD, stable MS, stable hypothyroidism, and chest pain. (Tr. 1148-1150). A nuclear stress test was planned. (Tr. 1149).

### III.    Applicable Law:

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole.  Ramirez v. Barnhart, 292 F.3d 576, 583 (8th Cir. 2002).  Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision.  The ALJ's decision must be affirmed if the record contains substantial evidence to support it.  Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003).  As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently.  Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).  In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed.  Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir.2001); see also 42 U.S.C. § § 423(d)(1)(A), 1382c (a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382(3)(C). A Plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience. See 20 C.F.R. §§ 404.1520, 416.920. Only if the final stage is reached does the fact finder consider the Plaintiff's age, education, and work experience in light of his residual functional capacity. See McCoy v. Schweiker, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C.F.R. §§ 404.1520, 416.920.

## IV.    Discussion:

Plaintiff argues the following issues on appeal:  1) Whether the ALJ properly considered Plaintiff's impairments in his RFC determination; and 2) Whether the ALJ erred in his credibility analysis.

### A.    Impairments and RFC Determination:

RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1).  It is assessed using all relevant evidence in the record. Id.  This includes medical records, observations of treating physicians and others, and the claimant's own descriptions of her limitations.  Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004).  Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace. Lewis v. Barnhart, 353 F.3d 642, 646 (8th Cir. 2003).  "[T]he ALJ is [also] required to set forth specifically a claimant's limitations and to determine how those limitations affect his RFC." Id.  In determining that Plaintiff maintained the RFC to perform light work with limitations, the ALJ considered Plaintiff's subjective complaints; his medical records; and the provided medical assessments. (Tr. 18-19).  Substantial evidence supports the ALJ's RFC determination.

Plaintiff contends the ALJ's RFC determination was not supported by substantial evidence because the ALJ failed to properly consider the evidence regarding Plaintiff's multiple sclerosis and/or white matter disease (MS), left upper extremity issues, headaches, fatigue, and mental impairments in assessing the RFC. (Doc. 13).

### a. Multiple Sclerosis

Plaintiff argues the ALJ questioned the validity of Plaintiff's MS diagnosis. (Doc. 13). Throughout the decision, however, the ALJ acknowledged that MS was an impairment and even classified it as a severe impairment at Step Two. (Tr. 15-16). As required by the Code of Federal Regulations, the ALJ considered all of Plaintiff's impairments, including the MS, in making his RFC determination. (Tr. 18-19). The Court should believe that the ALJ did what he claimed to do. See Wilburn v. Astrue, 626 F.3d 999, 1003 (8th Cir. 2010) (finding that when an ALJ states he would perform a duty with regard to claimant's case, it is presumed that the ALJ has discharged his duty).

The ALJ pointed out differences between the MS diagnoses in order to provide a complete picture of the medical evidence submitted into the record. The Plaintiff's MS diagnosis was evidenced by CT scans and MRI studies, but no spinal fluid analysis was conducted to help differentiate between trauma and other possible etiologies. (Tr. 660, 673, 689, 691, 734, 994). Dr. Belinga opined about cervical spine DJD as well as radiculopathy as the cause of Plaintiff's symptoms because MS did not produce as much pain as Plaintiff described. (Tr. 994). On September 9, 2014, a cervical spine MRI study showed some disc bulges, but not demyelinating lesions. (Tr. 1028). Nonetheless, Dr. Poemoceah consistently noted that Plaintiff's MS was stable during multiple office visits. (Tr. 1084, 1090-1093, 1140, 1148-1150). The above discussion of evidence was utilized solely by the ALJ to make a RFC determination and credibility analysis, and not to discredit the validity of Plaintiff's MS diagnosis.

Plaintiff also contends the ALJ should have recontacted Dr. Poemoceah for clarification regarding the opinion he provided on February 24, 2016. (Doc. 13). More

specifically, Plaintiff argues the ALJ's primary concern with the opinion regarded the visual disturbances or blindness limitations Dr. Poemoceah assessed. (Doc. 13). In response, Plaintiff argues that the visual disturbances Plaintiff experienced happened during headaches. (Doc. 13).

The Court notes that in determining Plaintiff's RFC, the ALJ discussed the provided medical opinions and set forth the reasons for the weight given to the opinions. Renstrom v. Astrue, 680 F.3d 1057, 1065 (8th Cir. 2012). The ALJ determined Dr. Poemoceah's treatment history of the Plaintiff consisted of normal physical exams throughout, and therefore he assigned no weight to Dr. Poemoceah's opinion. (Tr. 23). In concurrence with the ALJ, the Plaintiff acknowledged Dr. Poemoceah's own records did not document the objective basis for his opinion. (Doc. 13). In addition, Dr. Poemoceah's opinion consisted merely of a checklist form with no elaboration as to how the limitations he assessed were determined. See Anderson v. Astrue, 696 F.3d 790, 794 (8th Cir. 2012) (holding that a conclusory checkbox form has little evidentiary value when it "cites no medical evidence, and provides little to no elaboration"). A RFC assessment provided in this format without cited support in the record amounts to a conclusory opinion. See Johnson v. Astrue, 628 F.3d 991, 994 (8th Cir. 2011).

Furthermore, Dr. Poemoceah did not find that Plaintiff experienced visual limitations in his treatment records, but in the opinion he provided, Dr. Poemoceah assessed present impairment of the central visual acuity with remaining vision in the better eye after best correction was 20/200 or less. (Tr. 1040, 1083, 1086, 1089, 1092, 1095, 1097, 1099, 1103, 1118, 1124, 1133, 1136, 1139, 1145, 1148). Dr. Poemoceah's visual assessment was clearly inconsistent with the medical evidence he provided. Prosch v. Apfel, 201 F.3d 1010, 1012 (8th 2000) (the ALJ may reject the conclusions of any medical expert, whether hired by the

claimant or the government, if they are inconsistent with the record as a whole). Plaintiff's argument that the visual disturbances occurred due to headaches was solely based upon his subjective complaints with no objective evidence cited in support. (Tr. 360, 689).

In response to Plaintiff's contention that the ALJ should recontact Dr. Poemoceah for further clarification, the ALJ is not required to function as Plaintiff's substitute counsel, but only to develop a reasonably complete record. See Shannon v. Chater, 54 F.3d 484, 488 (8th Cir. 1995) ("reversal due to failure to develop the record is only warranted where such failure is unfair or prejudicial"). The Court finds the ALJ was not required to recontact Dr. Poemoceah because the medical evidence record was adequate to determine Plaintiff's disability. See Jones v. Astrue, 619 F.3d 963, 969 (8th Cir. 2010). The Court also finds the ALJ properly evaluated Dr. Poemoceah's opinion by providing good reasons for the weight assigned.

### b. Left Upper Extremity

In regards to the left upper extremity, Plaintiff contends the ALJ's limitation of him to light work with only occasional reaching and handling bilaterally does not account for the decreased sensation and tremors, which would limit the ability to finger and feel. (Doc. 13). The medical evidence and provided assessments do not support Plaintiff's contention. On December 11, 2014, Dr. Ogg, Plaintiff's orthopedic surgeon, determined Plaintiff could resume normal activities with no restrictions less than three months after an ulnar nerve decompression of the left elbow and medial epicondylectomy. (Tr. 807-809, 969-971). On March 10, 2015, Dr. Ogg diagnosed Plaintiff with left shoulder rotator cuff tendinitis, no full-thickness cuff tear, and perhaps some slight articular surface thinning. (Tr. 976-977). After administering a Cortisone injection into the left shoulder, Dr. Ogg recommended PT for

26

Plaintiff's left shoulder and elbow, but there was no evidence in the record that Plaintiff ever received the intended therapy services. (Tr. 977).

Afterwards, Plaintiff received medical treatment primarily from Dr. Poemoceah beginning on or about January 14, 2016 through the date of the decision on September 26, 2016. Dr. Poemoceah provided conservative treatment for the diagnosed impairments, and his physical examinations of the Plaintiff were normal including normal inspection, palpation, range of motion, and strength in his upper extremities. (Tr. 1083, 1086, 1089, 1092, 1094-1095, 1097-1098, 1109, 1118, 1124, 1136-1137, 1139-1140, 1145-1146, 1148-1149).

Regarding Plaintiff's allegations about decreased sensation and tremors, Dr. Al-Khatib noted during a neurological consultative examination on May 12, 2015 that there was evidence of very mild action and postural-type tremor involving both hands. (Tr. 1017). Upon exam, Plaintiff had diminished pinprick and light to sensation over the left upper and lower extremities, 5/5 motor strength throughout, and normal deep tendon reflexes. (Tr. 1017). Dr. Al-Khatib diagnosed Plaintiff with mild benign essential tremor, and Dr. Al-Khatib assessed there was no definite evidence of limitations in sitting, standing, walking, carrying, handling objects, hearing, speaking, or traveling. (Tr. 1017). In addition, both of the non-examining consultants assigned to assess Plaintiff's physical RFC, Drs. Thomas and Redd, found Plaintiff could perform the full range of light work. (Tr. 130-131, 169-170). Consequently, the records relating to the relevant time period support the ALJ's RFC determination as it relates to Plaintiff's left upper extremity.

### c.  Headaches

Plaintiff argues the ALJ did not properly evaluate Plaintiff's headache impairment because absences from work or decrease in attention or concentration due to headaches were not accounted for in the RFC assessment. (Doc. 13).  In making his RFC determination, the ALJ found headaches to be a severe impairment, and the impairment was considered when making the determination. (Tr. 16-19); Craig v. Apfel, 212 F.3d 433, 436 (8th Cir. 2000) (administrative law judge is not required to discuss all evidence, and failure to cite specific evidence does not mean it was not considered).  Nevertheless, the relevant medical records regarding headaches did not support Plaintiff's alleged limitations.

For instance, Plaintiff described to Dr. Al-Khatib that his headaches consisted of pressure with no associated photophobia, phonophobia, nausea, or vomiting. (Tr. 1016-1017). Dr. Al-Khatib diagnosed Plaintiff with chronic headaches with tension features, and the record showed his headaches were relieved with medications such as Gabapentin and Imitrex. (Tr. 1016-1017).  Dr. Al-Khatib also did not find definitive limitations from headaches in the assessment he provided.  (Tr. 1016-1017).  In addition, Dr. Poemoceah, Plaintiff's most recent treating physician, prescribed Sumatriptan Succinate for migraine headaches on a regular basis with no reported problems.  The ALJ acknowledged Plaintiff's history of headaches, but the medical evidence did not warrant additional functional limitations beyond what was found in the ALJ's RFC assessment.

### d.  Fatigue

Plaintiff contends his fatigue allegations were not accounted for in the RFC determination. (Doc. 13).  Plaintiff alleges his fatigue caused him to need naps during the day, and it would prevent him from completing a full workday. (Doc. 13).  However, the ALJ did

not find Plaintiff's fatigue constituted a severe impairment due to a lack of evidence in the record that showed it significantly limited his physical or mental ability to do basic work activities. (Tr. 16); See 20 C.F.R. §§ 404.1520(c), 416.920(c); see also Pelkey v. Barnhart, 433 F.3d 575, 577 (8th Cir. 2006). Along with the lack of objective support, the Plaintiff denied fatigue and malaise throughout the record, which is in contradiction to his allegations. (Tr. 509, 539, 773, 806, 887, 992, 1019). Plaintiff's fatigue allegations were based on his subjective complaints and not on objective evidence in the medical record.

Although not determined to be a severe impairment, the ALJ still considered Plaintiff's fatigue allegations when making his RFC determination. For example, the ALJ evaluated Dr. Walz's mental consultative examination. Dr. Walz opined Plaintiff's ability to persist could be affected by fatigue associated with MS, and his ability to persist, reported fatigue associated with MS, and speed of information processing was a bit slow. (Tr. 24, 934). The ALJ decided to give little weight to Dr. Walz's opinion due to substantiated reasons discussed below in further detail. As a result, the evidence supports the ALJ"s decision to not include additional limitations from fatigue into the RFC.

### e. Mental Impairments

Plaintiff argues the ALJ failed to properly evaluate his mental capacity to work, and contends the ALJ erred in rejecting Dr. Walz's opinion. (Doc. 13). In his decision, the ALJ fully considered the mental RFC assessment provided by Dr. Walz, but ultimately assigned little weight to her opinion because she examined the Plaintiff only one time, and there were no objective findings in her own report or the other substantial medical evidence of record as a whole which supported the severe limitations she had assessed. (Tr. 24). Plaintiff's mental health treatment in the record consisted merely of Celexa and Cymbalta prescriptions to treat

his depression, with reports of the medications helping a little bit, and he never underwent specialized treatment such as counseling, medication management, or psychiatric hospitalization. (Tr. 23, 932, 1032). The ALJ, not a physician or a vocational expert, is responsible for assessing a claimant's RFC. "The ALJ may reject the opinion of any medical expert where it is inconsistent with the medical record as a whole." Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002).

The ALJ further assigned significant weight to the mental RFC assessments made by Drs. Brown and Santulli, two non-examining consultants that both found Plaintiff could perform semiskilled work. (Tr. 24-25, 131-133, 170-172). The ALJ noted that he gave their opinions significant weight because both opinions were consistent with each other and with the objective findings of the medical evidence as a whole, including the findings noted by Dr. Walz in her mental consultative examination. (Tr. 24-25). See Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir.2002); Renstrom v. Astrue, 680 F.3d 1057, 1065 (8th Cir. 2012). The ALJ properly accounted for these opinions and the weight assigned when he made his RFC determination. (Tr. 18-19).

Plaintiff contends that there was no neuropsychological examination conducted in the case, and if the ALJ questioned Dr. Walz's opinion, he could have sent Plaintiff for a more formal assessment. (Doc. 13). Plaintiff also argues Dr. Rutherford recommended a neuropsychological examination for further evaluation of Plaintiff's MS. (Doc. 13). The Eighth Circuit has held that an ALJ is not required to order a consultative examination of every alleged impairment; he simply has the authority to do so if the existing medical sources do not contain sufficient evidence to make an informed decision. See Matthews v. Bowen, 879 F.2d 422, 424 (8th Cir. 1989). "There is no bright line rule indicating when the Commissioner has

30

or has not adequately developed the record; rather, such an assessment is made on a case-by-case basis." Mans v. Colvin, No. 13-CV-2103, 2014 WL 3689797 at *4 (W.D. Ark., July 24, 2014)(quoting Battles v. Shalala, 36 F.3d 43, 45 (8th Cir. 1994).

The ALJ had before him Dr. Walz's opinion as well as the assessments completed by Drs. Brown and Santulli, which provided sufficient evidence for the ALJ to make an informed decision regarding Plaintiff's mental capacity. There was evidence in the record, such as the office visits with Dr. Poemoceah, which showed Plaintiff's MS was stable which was in contradiction to his subjective complaints. Tr. 1084, 1090-1093, 1119, 1140, 1148-1150). The Court believes that other evidence in the record, including Plaintiff's own statements, constituted evidence regarding Plaintiff's mental limitations and that the existing medical sources contained sufficient evidence for the ALJ to make his RFC determination without the need to order a neuropsychological examination.

Based upon the foregoing, the Court finds there is substantial evidence to support the ALJ's RFC determination.

**B.    Credibility Analysis:**

The ALJ was required to consider all the evidence relating to Plaintiff's subjective complaints including evidence presented by third parties that relates to: (1) Plaintiff's daily activities; (2) the duration, frequency, and intensity of his pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of his medication; and (5) functional restrictions. See Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole. Id. As the Eighth Circuit has observed, "Our touchstone is

that [a claimant's] credibility is primarily a matter for the ALJ to decide." Edwards, 314 F.3d at 966.

Plaintiff contends the ALJ's credibility assessment was not supported by substantial evidence, and more specifically, his activities of daily living ("ADLs") were not inconsistent with a finding of disability. (Doc. 13). After reviewing the administrative record, it is clear that the ALJ properly considered and evaluated Plaintiff's credibility. There is support in the record for the ADLs the ALJ relied upon in his credibility determination despite the more limited ADLs Plaintiff described in his brief. In the decision, the ALJ found the RFC assessment was supported by Plaintiff's testimony as to his ADLs that included the following: working as a firefighter, doing farm labor, performing personal care, preparing some meals, driving, walking 30 minutes to an hour in the evenings, and socializing with friends. (Tr. 25). Although it is clear that Plaintiff suffers with some degree of limitation, he has not established that he is unable to engage in any gainful activity. ALJs are "in a better position to evaluate credibility," and we defer to the ALJ's credibility determination because it was supported by "good reasons and substantial evidence." Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006).

With regard to the multiple Third Party Statements and testimony provided by Plaintiff's wife, the ALJ properly considered this evidence but found it unpersuasive. This determination was within the ALJ's province. See Siemers v. Shalala, 47 F.3d 299, 302 (8th Cir. 1995); Ownbey v. Shalala, 5 F.3d 342, 345 (8th Cir. 1993).

While the record reveals that Plaintiff has a history headaches, depression and/or anxiety, the impairments appear to be well-controlled with conservative treatment. See Black v. Apfel, 143 F.3d 383, 386 (8th Cir.1998); Robinson v. Sullivan, 956 F.2d 836, 840 (8th Cir. 1992) (course of conservative treatment contradicted claims of disabling pain). Plaintiff's

treatment for these impairments included only prescription medications with minimal reported side effects. The effectiveness of treatment also diminishes the credibility of the Plaintiff's complaints regarding his left upper extremity. See Gulliams v. Barnhart, 393 F.3d 798, 802 (8th Cir. 2005). Dr. Ogg determined on December 11, 2014, that Plaintiff's left elbow improved enough three months post-surgery that he could resume normal activities with no restrictions. (Tr. 969-971). In addition, Plaintiff engaged in activities that discounted his credibility. For example, Plaintiff failed to attend PT as prescribed for his left shoulder. Guilliams v. Barnhart, 393 F.3d 798, 802 (8th Cir. 2005) (a failure to follow a recommended course of treatment also weighs against a claimant's credibility).

Significantly, Plaintiff continued to participate in some work and/or work-like tasks after the alleged onset date that revealed he was not as limited as he alleged. On July 25, 2013, Ms. Sullivan, Plaintiff's physical therapist, noted that Plaintiff in his capacity as a volunteer firefighter was "able to perform all activities even when fatigued [secondary] to going to fire early in the morning on little sleep. (Tr. 845). Next, on September 25, 2013, Plaintiff reported to Ms. Sullivan that he carried a 50-pound backpack up several flights of stairs three times and it felt good. (Tr. 906). Later, on December 26, 2015, Plaintiff went to the emergency department after a piece of metal that measured 14-15 feet long fell on him two days prior at work. (Tr. 1047-1057). Plaintiff also reported to his physical therapist that on two different occasions that he had been "chasing cows" and "had to get some horses." (Tr. 918, 926). Plaintiff's report of these extensive activities during the relevant time period was inconsistent with his allegations of disabling pain. See Riggins v. Apfel, 177 F.3d 689, 693 (8th Cir. 1999).

33

Based upon the foregoing, as well as for those reasons given in Defendant's well stated brief, the undersigned believes there is substantial evidence to support the ALJ's credibility analysis.

## V.    Conclusion:

Based on the foregoing, the Court recommends affirming the ALJ's decision, and dismissing Plaintiff's case with prejudice.  **The parties have fourteen days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 30th day of January, 2018.

/s/  *Erin L. Wiedemann*
HON. ERIN L. WIEDEMANN
UNITED STATES MAGISTRATE JUDGE